**F I L E D**
CLERK, U.S. DISTRICT COURT

2/15/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ VAM _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

April 2021 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>JUANITA ALMUETE ANTENOR,<br>  aka "Shann,"<br>  aka "Shan,"<br>VICTOR CONTRERAS, M.D., and<br>CALLIE JEAN BLACK,<br>  aka "Callie Broughton Black,"<br><br>  Defendants. | CR  2:22-cr-00043-AB<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1347(a)(2): Health Care Fraud; 42 U.S.C. § 1320a-7b(b)(2)(A): Paying Illegal Remunerations for Health Care Referrals; 42 U.S.C. § 1320a-7b(b)(1)(A): Receiving Illegal Remunerations for Health Care Referrals; 18 U.S.C. § 982(a)(7): Criminal Forfeiture] |

The Grand Jury charges:

COUNTS ONE THROUGH SIX

[18 U.S.C. §§ 1347(a)(2), 2(b)]

[Defendants ANTENOR and CONTRERAS]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1.   Defendant JUANITA ALMUETE ANTENOR, also known as ("aka") "Shann," aka "Shan," was a resident of Pasadena, California.

2.   Defendant ANTENOR was the President, Chief Executive Officer ("CEO"), and Chief Financial Officer ("CFO") of Arcadia

Hospice Provider, Inc. ("Arcadia"), a hospice provider located at 3452 E. Foothill Boulevard, Suite 120, Pasadena, California. Defendant ANTENOR enrolled Arcadia as a hospice provider with Medicare in or around April 2012, and was a signatory on the Wells Fargo and JPMorgan Chase bank accounts into which Medicare and Medi-Cal payments for Arcadia were deposited (the "Arcadia Wells Fargo Account" and "Arcadia Chase Account," respectively).

3.    Beginning in or around July 2015, defendant ANTENOR was also the CFO of Saint Mariam Hospice, Inc. ("St. Mariam"), a hospice provider located at 3452 E. Foothill Boulevard, Pasadena, California, in Suite 230 and then, beginning in or around September 2017, in Suite 122.  Defendant ANTENOR was a signatory on the Bank of America bank account into which Medicare and Medi-Cal payments for St. Mariam were deposited (the "St. Mariam Bank of America Account").

4.    Defendant VICTOR CONTRERAS, M.D., was a resident of Santa Paula, California.  Defendant CONTRERAS was a physician licensed in the State of California, who maintained a practice in Santa Paula, California.  Defendant CONTRERAS also worked for Arcadia and St. Mariam from in or around July 2016 to in or around February 2019.  At the time of his employment with Arcadia and St. Mariam, defendant CONTRERAS was on probation with the California Medical Board and, as a result, was subject to certain restrictions on aspects of his medical practice that would typically be involved in the provision of hospice services, including restrictions relating to controlled substances and practicing, performing, or treating patients in the area of pain management.

<u>The Medicare and Medi-Cal Programs</u>

5.    Medicare was a federal health care benefit program, affecting commerce, that provided benefits to individuals who were 65 years and older or disabled.  Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.

6.    Medi-Cal was a health care benefit program, affecting commerce, for indigent individuals in California.  Funding for Medi-Cal was shared between the federal government and the State of California.  The California Department of Health Care Services administered the Medi-Cal program, authorizing provider participation, determining beneficiary eligibility, issuing Medi-Cal cards to beneficiaries, and promulgating regulations for the administration of the program.

7.    Individuals receiving Medicare and Medi-Cal benefits were known as "beneficiaries."  Each Medicare beneficiary was given a Health Insurance Claim Number ("HICN") unique to that beneficiary.

8.    Hospices, physicians, and other health care providers who provided services to beneficiaries that were reimbursed by Medicare and Medi-Cal were referred to as "providers."

9.    To become eligible to participate in Medicare, Medicare required prospective providers to be licensed by a state or local agency.  After obtaining the applicable license, Medicare required prospective hospice providers to submit an application in which the prospective provider agreed to: (a) comply with all Medicare-related laws and regulations, including the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), which prohibited the offering, paying, soliciting, or receiving of any remuneration for the referral of Medicare

beneficiaries; and (b) not submit claims for payment to Medicare knowing they were false or fraudulent or with deliberate ignorance or reckless disregard of their truth or falsity.  If Medicare approved the application, Medicare assigned the provider an identifying number, which enabled the provider to submit claims to Medicare for reimbursement for services provided to Medicare beneficiaries.

10.  Medicare and Medi-Cal reimbursed providers for hospice services provided to a beneficiary only if the beneficiary was terminally ill, as certified by both the beneficiary's attending physician, if the beneficiary has one, and the medical director or a physician member of the hospice's interdisciplinary group ("IDG"). The attending physician was the physician that the beneficiary identified when he/she elected to receive hospice care as the medical practitioner with the most significant role in the determination and delivery of the beneficiary's medical care.  Medicare and Medi-Cal considered a beneficiary to be "terminally ill" if the beneficiary's life expectancy was six months or less if the beneficiary's illness ran its normal course.  Hospice services reimbursed by Medicare and Medi-Cal were palliative in nature and included, but were not limited to, medications to manage pain symptoms, necessary medical equipment, and bereavement services to surviving family members.  Once a beneficiary chose hospice care, Medicare would not cover treatment intended to cure the beneficiary's terminal illness.  The election form was required to include an acknowledgement that the beneficiary had been given a full understanding of hospice care, including the palliative rather than curative nature of treatment, and an acknowledgement that the beneficiary understood that certain Medicare services were waived by the election of hospice care.

11.   Medicare was divided into different program "parts": Part A, Part B, Part C, and Part D.  Medicare covered hospice services for those beneficiaries who were eligible for Medicare Part A (hospital-related services).  When a Medicare beneficiary elected hospice coverage, the beneficiary waived all rights to Medicare Part B (outpatient physician services and procedures) coverage of services to treat or reverse the beneficiary's terminal illness while the beneficiary was on hospice.

12.   A beneficiary could elect to receive hospice benefits for two periods of 90 days and, thereafter, additional services for periods of 60 days per period.

13.   After the second 90-day period, for the beneficiary to continue to receive reimbursable hospice benefits, Medicare required that a physician re-certify that the beneficiary was terminally ill and include clinical findings or other documentation supporting the diagnosis of terminal illness.  For re-certifications, Medicare required a hospice physician or nurse practitioner to meet with the beneficiary in person and conduct a face-to-face evaluation before signing a certification of terminal illness.

14.   Most providers, including Arcadia and St. Mariam, submitted their claims electronically pursuant to an agreement with Medicare that they would submit claims that were accurate, complete, and truthful.

B.   THE FRAUDULENT SCHEME

15.   Beginning in or around July 2014, and continuing through at least in or around March 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendant ANTENOR, together with defendant CONTRERAS beginning in or around July 2016,

5

1  and others known and unknown to the Grand Jury, aiding and abetting

2  each other, knowingly, willfully, and with intent to defraud,

3  executed, and willfully caused to be executed, a scheme and artifice

4  to obtain money from Medicare and Medi-Cal by means of material false

5  and fraudulent pretenses, representations, and promises, and the

6  concealment of material facts in connection with the delivery of and

7  payment for health care benefits, items, and services.

8  C.   MEANS TO ACCOMPLISH THE SCHEME TO DEFRAUD

9       16.   The fraudulent scheme operated, in substance, in the

10  following manner:

11           a.   Defendant ANTENOR solicited patient referrals from

12  individuals, including Callie Jean Black, aka "Callie Broughton

13  Black," variously identified as "marketers," "community liaisons"

14  and/or "patient care coordinators" ("marketers").  Defendant ANTENOR

15  directed some of the marketers, including Black, to send referrals to

16  defendant ANTENOR at her personal email address.

17           b.   Defendant ANTENOR paid and directed other Arcadia and

18  St. Mariam employees to pay these marketers kickbacks in exchange for

19  referring beneficiaries, which beneficiaries defendant ANTENOR and

20  Arcadia and St. Mariam employees acting at her direction would then

21  divide up between Arcadia and St. Mariam.  The amount of the kickback

22  varied, as did the payment structure.  Some marketers were paid a

23  certain amount per patient; others were paid an amount for their

24  patient referrals plus a fee each month that the referred patient

25  remained on hospice care with Arcadia or St. Mariam.  Some marketers

26  were paid in cash; others, including Black, received checks.

27           c.   Defendant ANTENOR knew that these marketers were often

28  referring beneficiaries who lived 50 or more miles away from Arcadia

6

and St. Mariam's location and would not likely have been referred to providers so far away without incentives to secure their recruitment. Defendant ANTENOR also knew that these marketers were at times referring beneficiaries whose placement in hospice raised red flags because, for example, they were married or related and improbably starting hospice services on or about the same date.

d.   As defendant ANTENOR knew, many of the beneficiaries referred to Arcadia and St. Mariam by marketers were not eligible to receive hospice benefits from Medicare because they were not terminally ill.  Defendant ANTENOR nonetheless enrolled these beneficiaries and caused them to be enrolled in hospice services with Arcadia or St. Mariam and then kept them on service, often for more than one 90-day period.  Some beneficiaries were admitted to the hospices before any physician had determined they were hospice appropriate.  Many beneficiaries did not even know they had been enrolled in hospice and were enrolled with Arcadia and St. Mariam physicians as their purported attending physicians, even though the beneficiaries had primary care physicians managing their care.

e.   Arcadia and St. Mariam employed defendant CONTRERAS, along with several other physicians, to purportedly examine patients and determine whether they were hospice-appropriate.  Defendant CONTRERAS diagnosed beneficiaries with conditions they did not, in fact, have, and certified as terminally ill beneficiaries who were not, in fact, terminally ill, including beneficiaries that he never even saw or examined.

f.   As defendant ANTENOR knew, the majority of the beneficiaries purportedly receiving hospice services from Arcadia and St. Mariam, including those diagnosed and/or certified by defendant

CONTRERAS, were not medically eligible for hospice services and did not pass away within six months of beginning hospice services, as would have been expected if the beneficiaries had actually been suffering from a hospice-eligible medical condition.  As defendant ANTENOR knew, some beneficiaries did not receive the services from Arcadia or St. Mariam employees that the beneficiaries should have received under their plans of care.

g.    In an effort to support the provision of medically unnecessary hospice services, Arcadia and St. Mariam reported to Medicare and/or maintained documentation in the patient files that defendant ANTENOR knew did not accurately reflect the beneficiaries' conditions or support the provision of hospice services, including the conditions and diagnoses documented by defendant CONTRERAS.  In some cases, defendant ANTENOR knew the files reflected medical conditions documented by someone other than the nurse or doctor who examined the beneficiaries, and that the documentation was false.

h.    In particular, in order to conceal the fraudulent nature of his certifications, defendant CONTRERAS, acting at the request of Arcadia and St. Mariam employees, would backdate history and physical forms to make it appear that he had seen the beneficiaries before they had been admitted to or recertified by the hospices.  In fact, as defendant CONTRERAS knew, those visits, if they occurred at all, occurred after those admissions and recertifications.  Defendant CONTRERAS also created history and physical forms for beneficiaries on dates when he was not in the country.

i.    In order to conceal the fact that Arcadia and St. Mariam were billing for beneficiaries who were not terminally ill,

defendant ANTENOR would also discharge beneficiaries from the hospice to which the beneficiaries were originally assigned only to arrange for the beneficiaries to be transferred to the other hospice.

j.   Even though defendant ANTENOR knew that the beneficiaries did not qualify for hospice services, defendant ANTENOR caused Arcadia and St. Mariam to submit fraudulent claims for reimbursement to Medicare and Medi-Cal for those medically unnecessary services (some of which were never even performed), including for beneficiaries obtained through the payment of illegal kickbacks.  Reimbursements based on those fraudulent claims would be deposited into bank accounts held by Arcadia and St. Mariam.

17.   Between in or around September 2014 and April 2019, Arcadia submitted to Medicare approximately $22,977,979 in claims for hospice services provided to beneficiaries and was paid approximately $18,853,757 for those claims.  Of that paid amount, approximately $3,080,621 was paid for beneficiaries associated with attending provider defendant CONTRERAS.  Between in or around December 2014 and in or around March 2019, Arcadia submitted to Medi-Cal approximately $3,259,451 in claims for hospice services and was paid approximately $740,090 for those claims.

18.   Between in or around February 2015 and in or around April 2019, St. Mariam submitted to Medicare approximately $13,742,116 in claims for hospice services provided to beneficiaries and was paid approximately $11,395,849 for those claims.  Of that paid amount, approximately $2,262,823 was paid for beneficiaries associated with attending provider defendant CONTRERAS.  Between in or around March 2015 and in or around March 2019, St. Mariam submitted to Medi-Cal

approximately $2,370,475 in claims for hospice services and was paid approximately $610,964 for those claims.

D.   <u>EXECUTIONS OF THE FRAUDULENT SCHEME</u>

19.   On or about the dates set forth below, within the Central District of California, and elsewhere, the defendants listed below, together with others known and unknown to the Grand Jury, aiding and abetting each other, knowingly and willfully executed and willfully caused the execution of the fraudulent scheme described above by submitting and causing to be submitted to Medicare the following false and fraudulent claims for payment of hospice services:

| COUNT | DEFENDANTS | CLAIM NO. | DATE SUBMITTED / ENTITY | AMOUNT BILLED | BENEFICIARY |
|---|---|---|---|---|---|
| ONE | ANTENOR, CONTRERAS | 21706100980907CAR | 3/2/2017 / Arcadia | $710.00 | A.B. |
| TWO | ANTENOR, CONTRERAS | 21706101169107CAR | 3/2/2017 / St. Mariam | $2,940.00 | C.C. |
| THREE | ANTENOR, CONTRERAS | 21706200390307CAR | 3/3/2017 / Arcadia | $5,720.00 | A.P. |
| FOUR | ANTENOR | 21712300295207CAR | 5/3/2017 / St. Mariam | $7,427.63 | P.M. |
| FIVE | ANTENOR, CONTRERAS | 21718400966907CAR | 7/3/2017 / Arcadia | $7,697.84 | O.B. |
| SIX | ANTENOR, CONTRERAS | 21721300829607CAR | 8/1/2017 / St. Mariam | $1,706.45 | O.M. |

COUNTS SEVEN THROUGH TEN

[42 U.S.C. § 1320a-7b(b)(2)(A); 18 U.S.C. § 2(b)]

[Defendant ANTENOR]

20.  The Grand Jury realleges paragraphs 1-14 and 16-18 of this Indictment here.

21.  On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendant ANTENOR, together with others known and unknown to the Grand Jury, knowingly and willfully offered and paid, and caused to be offered and paid, remuneration, namely, the following amounts payable by checks drawn on the bank accounts listed, which constituted kickbacks to marketers for referring patients to Arcadia and St. Mariam for hospice services, for which payment could be made in whole and in part under a Federal health care program, namely, Medicare:

| COUNT | CHECK DATE | CHECK INFORMATION | APPROXIMATE AMOUNT |
|-------|-----------|-------------------|--------------------|
| SEVEN | 10/4/2017 | Check no. 3704 drawn on the Arcadia Chase Account and payable to Marketer 1 | $1,000.00 |
| EIGHT | 7/19/2018 | Check no. 5373 drawn on the Arcadia Chase Account and payable to Callie Broughton Black | $2,000.00 |
| NINE | 8/30/2018 | Check no. 4568 drawn on the St. Mariam Bank of America Account and payable to Calle Broughton Black | $2,000.00 |
| TEN | 10/15/2018 | Check no. 5920 drawn on the Arcadia Chase Account and payable to Callie Broughton Black | $1,000.00 |

COUNTS ELEVEN THROUGH FOURTEEN

[42 U.S.C. § 1320a-7b(b)(1)(A)]

[Defendant BLACK]

22.  The Grand Jury realleges paragraphs 1-14 and 16-18 of this Indictment here.

23.  Defendant CALLIE JEAN BLACK, aka "Callie Broughton Black," was a resident of Lancaster, California.  Defendant BLACK recruited beneficiaries for Arcadia and St. Mariam between in or around August 2015 and in or around January 2019.

24.  On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendant BLACK knowingly and willfully solicited and received remuneration, namely, the following amounts payable by checks drawn on the bank accounts listed, which constituted kickbacks for referring patients to Arcadia and St. Mariam for hospice services, for which payment could be made in whole and in part under a Federal health care program, namely, Medicare:

| COUNT | CHECK DATE | CHECK INFORMATION | APPROXIMATE AMOUNT |
|-------|-----------|-------------------|--------------------|
| ELEVEN | 10/15/2018 | Check no. 5920 drawn on the Arcadia Chase Account and payable to Callie Broughton Black | $1,000.00 |
| TWELVE | 11/7/2018 | Check no. 1005 drawn on the St. Mariam Bank of America Account and payable to Callie Broughton Black | $333.33 |
| THIRTEEN | 12/31/2018 | Check no. 1358 drawn on the Arcadia Chase Account and payable to Callie Broughton Black | $2,000.00 |
| FOURTEEN | 12/31/2018 | Check no. 1323 drawn on the St. Mariam Bank of America Account and payable to Callie Broughton Black | $3,000.00 |

FORFEITURE ALLEGATION

[18 U.S.C. § 982]

1.   Pursuant to Rule 32.2(a), Fed. R. Crim. P., notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(7), in the event of any defendant's conviction of the offenses set forth in any of Counts One through Fourteen of this Indictment.

2.   Any defendant so convicted shall forfeit to the United States of America the following:

(a)   All right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense of conviction; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as a result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been

1   substantially diminished in value; or (e) has been commingled with

2   other property that cannot be divided without difficulty.

3

4                                          A TRUE BILL

5

6                                          _/S/_____

7                                          Foreperson

8   TRACY L. WILKISON
    United States Attorney

9

10

11  SCOTT M. GARRINGER
    Assistant United States Attorney

12  Chief, Criminal Division

13  RANEE A. KATZENSTEIN
    Assistant United States Attorney

14  Chief, Major Frauds Section

15  KRISTEN A. WILLIAMS
    Assistant United States Attorney

16  Deputy Chief, Major Frauds
    Section

17

18

19

20

21

22

23

24

25

26

27

28